**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**ROANOKE DIVISION**

| | | |
|---|---|---|
| **DEREK M.,**[1] | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **CIVIL ACTION NO. 7:19–CV–824** |
| | ) | |
| **ANDREW SAUL** | ) | |
| **COMMISSIONER OF SOCIAL SECURITY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## REPORT AND RECOMMENDATION

Plaintiff Derek M. ("Derek") filed this action challenging the final decision of the Commissioner of Social Security ("Commissioner") finding him not disabled and therefore ineligible for disability insurance benefits ("DIB") under the Social Security Act ("Act"). 42 U.S.C. §§ 401–433. Derek alleges that the Administrative Law Judge ("ALJ") erred by failing to properly: (1) weigh his treating physicians' opinions, (2) assess his RFC, (3) assess his allegations regarding his symptoms, and (4) consider the U.S. Department of Veterans Affairs' ("VA") disability determination.

I conclude that substantial evidence supports the Commissioner's decision in all respects. Accordingly, I **RECOMMEND GRANTING** the Commissioner's Motion for Summary Judgment (Dkt. 16) and **DENYING** Derek's Motion for Summary Judgment (Dkt. 10).

## STANDARD OF REVIEW

---

[1] Due to privacy concerns, I use only the first name and last initial of the claimant in social security opinions.

The court limits review to a determination of whether substantial evidence exists to support the Commissioner's conclusion that Derek was not disabled under the Act.[2] Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001). This standard of review requires the Court to "look[] to an existing administrative record and ask[] whether it contains 'sufficien[t] evidence' to support the [ALJ's] factual determinations." Biestek v. Berryhill, 139 S. C.t 1148, 1154 (2019) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; it consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (internal citations omitted). "The threshold for such evidentiary sufficiency is not high." Biestek, 139 S. Ct. at 1154. The final decision of the Commissioner will be affirmed where substantial evidence supports the decision. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

## CLAIM HISTORY

Derek protectively filed for a period of disability and DIB on January 23, 2014,[3] claiming his disability began on June 20, 2012,[4] due to hip pain, digestive disorders, hypertensive cardiovascular disease and hypertension, post-traumatic stress disorder, cervical spine impairment, fibromyalgia, left knee impairment, headache impairment, and chronic obstructive

---

[2] The Act defines "disability" as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment, which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1)(A). Disability under the Act requires showing more than the fact that the claimant suffers from an impairment which affects her ability to perform daily activities or certain forms of work. Rather, a claimant must show that her impairments prevent her from engaging in all forms of substantial gainful employment given her age, education, and work experience. 42 U.S.C. § 423(d)(2); 1382c(a)(3)(B).

[3] Derek filed his application for DIB on February 10, 2014. R. 181.

[4] At Derek's April 19, 2019, hearing, he amended his onset date from January 1, 2008 to June 20, 2012. R. 35–36, 1531, 1561.

pulmonary disease. R. 178–82, 204, 1531. Derek's last date insured was December 31, 2013;

thus, he must show that his disability began on or before this date and existed for twelve

continuous months to receive DIB. R. 1532; 42 U.S.C. §§ 423(a)(1)(A), (c)(1)(B), (d)(1)(A); 20

C.F.R. §§ 404.101(a), 404.131(a). The state agency and ALJ Joseph Scruton previously denied

Derek's claims, however, this Court remanded the case on March 28, 2018, for further review.

R. 1–5, 8–30, 120–30, 132–38, 1600–13. The Appeals Council directed the ALJ to reevaluate

Derek's mental impairments. R. 1615–20. On November 16, 2018, ALJ Scruton held a second

hearing to consider Derek's claim. R. 1555–94. Counsel represented Derek at the hearing, which

included testimony from vocational expert Rick Bradley. R. 1585–91. On April 19, 2019, the

ALJ entered his decision analyzing Derek's claims under the familiar five-step process[5] and

denied his claim for benefits. R. 1531–47.

The ALJ found that Derek was insured at the time of the alleged disability onset and that

he suffered from the severe impairments of bilateral hip avascular/aseptic necrosis with a total

right hip replacement; degenerative disc disease of the lumbar spine; anxiety disorder; history of

Crohn's disease and colitis; knee arthritis; post-traumatic stress disorder; major depressive

disorder; history of attention deficit hyperactivity disorder; and alcohol abuse. R. 1533–34. The

ALJ determined that these impairments, either individually or in combination did not meet or

medically equal a listed impairment. R. 1534. The ALJ specifically considered listing 1.02

---

[5] The five-step process to evaluate a disability claim requires the Commissioner to ask, in sequence,
whether the claimant: (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals the
requirements of a listed impairment; (4) can return to his past relevant work; and if not, (5) whether he can perform
other work. Johnson v. Barnhart, 434 F.3d 650, 654 n.1 (4th Cir. 2005) (per curiam) (citing 20 C.F.R.§ 404.1520);
Heckler v. Campbell, 461 U.S. 458, 460–62 (1983). The inquiry ceases if the Commissioner finds the claimant
disabled at any step of the process. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The claimant bears the burden of
proof at steps one through four to establish a prima facie case for disability. At the fifth step, the burden shifts to the
Commissioner to establish that the claimant maintains the residual functional capacity ("RFC"), considering the
claimant's age, education, work experience, and impairments, to perform available alternative work in the local and
national economies.  42 U.S.C. § 423(d)(2)(A); Taylor v. Weinberger, 512 F.2d 664, 666 (4th Cir. 1975).

(major joint dysfunction), 1.04 (disorders of the spine), 5.06 (inflammatory bowel disease), 12.04 (depressive, bipolar, and related disorders), 12.06 (anxiety and obsessive-compulsive disorders), 12.11 (neurodevelopmental disorders), and 12.15 (trauma and stressor-related disorders). R. 1534–35. The ALJ found that regarding his mental impairments, Derek had moderate limitations in understanding, remembering, or applying information, interacting with others, and concentrating, persisting, or maintaining pace, and no limitation in adapting or managing oneself. R 1535–36.

The ALJ concluded that Derek retained the residual functional capacity ("RFC") to perform sedentary work with exceptions. R. 1537. Specifically, Derek requires a cane for walking beyond fifty feet and can never climb, crouch, crawl, or kneel, and can only occasionally stoop and balance. Id. The ALJ determined that Derek can perform simple tasks of a routine, repetitive nature that required no more than simple instructions and could have up to occasional interaction with the public, coworkers, and supervisors, but could have no direct interaction with large crowds or unfamiliar persons. Id. The ALJ determined that Derek was unable to perform any past relevant work, but he could perform jobs that exist in significant numbers in the national economy, such as addressing clerk and assembler. R. 1545–46. Thus, the ALJ determined that Derek was not disabled. R. 1546. Derek appealed the ALJ's decision and the Appeals Council denied his request for review on August 7, 2019. R. 1517–23.

## ANALYSIS

Derek alleges that the ALJ failed to properly weigh his treating physicians' opinions, assess his RFC, assess his allegations regarding his symptoms, and consider the VA's disability determination. Pl.'s Br. at 15–25, Dkt. 11. Derek suffers from several physical impairments, most notably chronic pain arising from avascular necrosis of both hips. He treated regularly for

pain prior to his date last insured with the Salem VA Medical Center ("Salem VAMC"). See, e.g., R. 385–466. Derek uses a cane to help him walk. R. 1543. He also suffers several mental impairments, notably anxiety and depression. R. 1544. Derek engaged in regular psychological services at the Salem VAMC and was referred to several treatment programs, though he was unable to attend due to issues with transportation. R. 588, 590. Derek generally argues that these mental and physical impairments prevent him from performing even limited, sedentary work. Pl.'s Br. at 15, Dkt. 11.

### A. Medical History Overview

Physical Health Evidence

Derek had a long history of treatment and surgery, including a right hip replacement, prior to his alleged onset date. See, e.g., R. 714, 720. Since Derek's alleged onset date, he has treated regularly at the Salem VAMC. See, e.g., R. 385–466 (showing regular appointments and phone calls related to his treatment). At his initial appointment in March 2012 (prior to the alleged onset date), Derek was evaluated by Christopher Lentz, PA-C, who diagnosed him with avascular necrosis, depression, and Crohn's disease. R. 607–08. At his follow-up appointment, he was additionally diagnosed with hypertension and chronic pain. R. 593.

In May 2012, Mr. Lentz started Derek on a Tylenol #3 regimen to address his pain. R. 592–93. He was continued on this same medication regimen through at least January 2014. See R. 547, 564–67, 572. Except for a smoking cessation clinic and some scattered reports of dizziness and high blood pressure, Derek's treatment as related to his avascular necrosis and chronic pain was consistent, see id., and Derek's providers reported that his pain was managed with the Tylenol #3. R. 397, 421, 431–32, 571–72, 636, 759. Derek's Crohn's disease was asymptomatic during this time period. Pl.'s Br. at 25, Dkt. 11.

<u>Mental Health Evidence</u>

Derek received mental health treatment from the Salem VAMC. <u>See</u>, <u>e.g.</u>, R. 385–466. In March 2012, Christina B. Shook, Psy.D., evaluated Derek for depression and post-traumatic stress disorder ("PTSD"). R. 598. Dr. Shook rated Derek's depression as "moderately severe," and diagnosed him with anxiety disorder, rule-out PTSD, and major depressive disorder.[6] R. 601–02. He continued psychotherapy sessions and follow-up phone calls with Dr. Shook and other providers through (and after) his DLI.[7] <u>See</u> R. 593, 561, 590.

Derek reported fairly consistent levels of depression throughout the period, barring several isolated incidents (e.g. death of a friend's cousin and frustration over benefits). <u>See</u> R. 530–32, 562–63, 586, 590, 594–96, 601–02. And, though he reported suicidal ideation prior to his amended onset date, his providers found he presented no risk of harm to himself or to others between his amended onset date and his DLI. R. 530–32, 562–63, 595–96, 601–02.

<u>Medical Opinion Evidence</u>

Mr. Lentz and John Gaylord, M.D.,[8] authored seven medical opinions after Derek's DLI between June 2014 and July 2018. R. 477, 483, 485, 617, 1478, 1819, 1824. All medical opinions backdate the symptoms to either 2007 or 2008, prior to Derek's treatment at Salem VAMC. <u>Id.</u> The first opinion, authored in June 2014, suggested that Derek's pain was managed

---

[6] Dr. Shook later diagnosed him with attention deficit hyperactivity disorder ("ADHD"), by history. R. 596.

[7] Early into his treatment, Dr. Shook provided Derek with information about additional resources, individual and group therapy, and a referral to the Center for Traumatic Stress. R. 590. Derek indicated interest, but transportation problems prevented involvement. R. 588.

[8] Though not raised by the ALJ or the parties, this court previously observed that "[t]here is no indication that Dr. Gaylord ever saw [Derek] during the time in which [he] still enjoyed insured status, and it is not clear whether Dr. Gaylord treated [Derek] except to complete the medical source statements." R. 1612. The medical opinions constitute several mental and physical questionnaires. Five are signed by Mr. Lentz, one is signed by Dr. Gaylord, and one is signed by both providers. R. 477, 483, 485, 617, 1478, 1819, 1824.

and indicated that no substitution in medication or other treatment was deemed necessary.

R. 477–78. Otherwise, the form suggested Derek would be unable to maintain gainful

employment, noting that Derek cannot maintain a constant sitting position, could not maintain a

seated or standing position for more than a couple hours, would experience pain that would

frequently interfere with his concentration, and would be absent from work more than three

times a month. R. 479–81. Mr. Lentz authored several opinions in November 2014 that largely

suggested the same limitations in Derek's ability to work, however, he also found that "recently

developed memory difficulties" would impair his ability to work. 483–89. A March 2016

opinion reported similar limitations, but it did not list memory issues. R. 617–21. In 2016 and

2018, Mr. Lentz and Dr. Gaylord completed several questionnaires related to mental

impairments. R. 1478, 1824. Both forms suggest limitations in attention and memory, with the

limitations becoming more severe over time. Id.

Prior to Derek's DLI, the VA determined Derek had a 90% service-connected disability,

including 50 percent for his hip prosthesis and 30 percent for colitis. R. 198–99, 1350–51. Derek

currently has a 100 percent disability rating from the VA. R. 1544.

Finally, there were several medical opinions authored by state consultative examiners in

2014. See R. 1544. These opinions noted that Derek "ha[d] a history of severe joint problems,

but there is not enough evidence to make a full decision on severity before the DLI." R. 87, 97.

These opinions further failed to provide an opinion on limitations regarding activities of daily

living, social functioning, and concentration, persistence or pace. R. 88, 98.

### B. Medical Opinions Dating After Derek's Date Last Insured[9]

---

[9] The Court previously raised this issue. The parties did not raise this issue in their briefing and the ALJ did not raise it expressly in his opinion.

Derek's date last insured ("DLI") was December 31, 2013. R. 13, 92. After Derek's DLI

Dr. Gaylord and Mr. Lentz authored several medical opinions that were backdated prior to

Derek's DLI. See, e.g., R. 477. This court previously suggested that the ALJ "give further

consideration to the possible relation back of medical evidence to a time prior to the termination

of insured status." R. 1605. Though the ALJ still arguably "place[s] significance on the fact that

the medical source statements were dated after the termination of the plaintiff's insured status in

this case," he does so in compliance with the governing case law. Id.

The Fourth Circuit held in Bird v. Comm'r that opinions made after a claimant's DLI

"are not automatically barred from consideration and may be relevant to prove a disability

arising before the claimant's [DLI]." 699 F.3d 337, 340 (4th Cir. 2012) (citing Wooldridge v.

Bowen, 816 F.2d 157, 160 (4th Cir. 1987)). The Fourth Circuit specifically held that post-DLI

evidence is admissible when there is "an inference of linkage with claimant's pre-[DLI]

condition." Id. at 341; see also Moore v. Finch, 418 F.2d 1224, 1226 (4th Cir. 1969)

(retrospective consideration is appropriate when "the record is not so persuasive as to rule out

any linkage" of the later complained of symptoms with his earlier symptoms). Conversely, post-

DLI evidence is not relevant when it is "not linked in any manner to the claimant's condition

before [his DLI]." Johnson v. Barnhart, 434 F.3d 650, 655–66 (4th Cir. 2005). Bird additionally

held that retrospective medical evidence is "especially appropriate when corroborated by lay

evidence," including testimony of a claimant about his pre-DLI condition. Bird, 699 F.3d at 342.

District courts have construed this broad principle somewhat narrowly, finding that the

linkage between a pre- and post-DLI condition needs to be consistent—in other words, it cannot

be "new evidence." See, e.g., Binnarr v. Colvin, 164 F. Supp. 3d 788, 792 (D.S.C. 2016) (finding

that medical records demonstrating "a *consistent* linkage between Plaintiff's condition" pre- and

post-DLI need be considered) (emphasis added); <u>Jones v. Colvin</u>, 2014 WL 4351607 (W.D. Va. 2014) (considering consistency with other medical evidence in determining whether there was a sufficient linkage between pre- and post-DLI evidence). Furthermore, courts have found that even if <u>Bird</u> requires an ALJ to consider post-DLI evidence, there is no requirement that the evidence "be given any specific weight" or that the ALJ "completely ignore the fact that such evidence was submitted after the DLI." <u>Brown v. Colvin</u>, No. 6:15-cv-2539, 2016 WL 5539522, at *3 n.4 (D.S.C. Sept. 30, 2016).

Importantly, the ALJ in this case considered post-DLI evidence and did not "automatically bar[] [it] from consideration." <u>See</u> R. 1536, 1541–42, 1544. As in his previous opinion, the ALJ included a detailed summary of each post-DLI medical opinion. <u>See</u> R. 1621–35. The ALJ then specifically considered this evidence in his analysis. <u>See</u> R. 1544 (considering evidence from post-DLI medical opinion, R. 480, including that Derek would "frequently" suffer pain that would interfere with his concentration); R. 1544 (weighing evidence of activities of daily living against pain described in post-DLI medical opinions); R. 1536 (considering pre- and post-DLI evidence of memory difficulties). In other words, the ALJ did consider and analyze the evidence as directed in <u>Bird</u>. 699 F.3d at 337, 340. The fact that the ALJ may have given it lesser weight is acceptable, especially given that he supports his conclusions with evidence from the record pre-DLI.[10] <u>See, e.g.</u>, <u>Brown</u>, 2016 WL 5539522, at *3 n.4.

**C. Treating Physician's Opinion**

---

[10] For instance, the ALJ consistently stated that there is no evidence pre-DLI of memory issues. This conclusion is not based on his ignoring or "barring" of post-DLI medical opinions. Rather, he based his conclusion on medical record evidence such as his treating psychiatrist's notes that Derek's "memory functions were intact" and that his "attention was good." R. 595, 601, 1539. In other words, any argument regarding the post-DLI medical opinions goes to weight—not whether the evidence was considered. <u>See</u> <u>Murdock v. Berryhill</u>, 2018 WL 1566338, *6 (W.D.N.C. March 30, 2018) ("The ALJ not only considered those opinions, he cited them in his decision and adequately explained the weight he allowed.").

Derek argues that the ALJ failed to give proper weight to the medical opinions of his treating physician, Dr. Gaylord,[11] as well as his treating physician's assistant, Mr. Lentz. Pl.'s Br. at 16–19, Dkt. 11. Derek specifically contends that the ALJ's conclusion "is a gross mischaracterization of the medical record," stating that Dr. Gaylord and Mr. Lentz's opinions were consistent with the treatment record. Id. at 16–17. Derek also argues that the ALJ improperly used his nonsignificant activities of daily living to discount the weight given to his treating providers.[12] Id. at 17.

Dr. Gaylord and Mr. Lentz completed a series of impairment questionnaires between June 2014 and July 2018, after Derek's DLI, that address Derek's physical and mental limitations. R. 477, 485, 617, 1478, 1819, 1824. The questionnaires suggest Derek experienced an increase in physical and mental symptoms over time. See id. The questionnaires further suggested that Derek would require regular breaks and that he would likely be absent three or more days per month due to pain or fatigue. See, e.g., R. 481.

The social security regulations require that an ALJ give the opinion of a treating source controlling weight if he finds the opinion "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence in [the] case record."[13] 20 C.F.R. § 404.1527(c)(2); Mastro v. Apfel, 270 F.3d 171, 178 (4th Cir.

---

[11] In his prior opinion the ALJ did not specify the weight given to Dr. Gaylord and Mr. Lentz's opinions. R. 1612. He specifies the weight in this opinion. See R. 1544.

[12] Derek additionally argues that the ALJ impermissibly "substitut[ed] his lay interpretation of the medical findings for the opinions from a treating medical source[]." Pl.'s Br. at 17, Dkt. 11. As described below, the medical record and Derek's self-reported activities of daily living support the ALJ's conclusion and, as such, the ALJ did not substitute his own lay opinion for that of medical sources.

[13] The social security regulations regarding the evaluation of medical opinion evidence have been amended for claims filed after March 27, 2017. See 20 C.F.R. §§ 404.1520c, 416.920c (setting out rules for claims filed on or after March 27, 2017, including that no specific evidentiary weight, including controlling weight will be given to any medical opinions). However, as this claim was filed prior to the effective date of the amended rule, I will apply the rules in 20 C.F.R. §§ 404.1527(c), 416.927.

2001); Brown v. Comm'r, 873 F.3d 251, 269 (4th Cir. 2017) (noting that "the ALJ is supposed to consider whether a medical opinion is consistent, or inconsistent, with other evidence in the record in deciding what weight to accord the opinion"). Thus, "[b]y negative implication, if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." Craig v. Chater, 76 F.3d 585, 590 (4th Cir. 1996). The ALJ must give "good reasons" for not affording controlling weight to a treating physician's opinion. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); Saul v. Astrue, No. 2:09–cv–1008, 2011 WL 1229781, at *2 (S.D.W. Va. March 28, 2011).

Further, if the ALJ determines that a treating physician's medical opinion is not deserving of controlling weight, the following factors must be considered to determine the appropriate weight to which the opinion is entitled: (1) the length of treatment and frequency of examination; (2) the nature and extent of the treatment relationship; (3) the opinion's support by medical evidence; (4) the opinion's consistency with the record as a whole; and (5) the treating physician's specialization. 20 C.F.R. §§ 404.1527(c)(2)–(5), 416.927(c)(2)–(5). "None of these factors may be omitted or disregarded by the ALJ in weighing the value of a treating physician's opinion." Ricks v. Comm'r, No. 2:09–cv–622, 2010 WL 6621693, at *10 (E.D. Va. Dec. 29, 2010). However, the ALJ "need not mechanically discuss every factor when choosing to afford a treating physician's opinion less weight, as long as the ALJ articulates the reasoning behind the decision." Haass v. Comm'r, Soc. Sec. Admin., No. CV BPG–17–1639, 2018 WL 2118705, at *1 (D. Md. Apr. 4, 2018).

Mr. Lentz, as a certified physician assistant, is not an acceptable medical source as defined by the Act. 20 C.F.R. §§ 404.1513, 416.913 (indicating "[w]e need evidence from acceptable medical sources to establish whether [a claimant has] a medically determinable

impairment" and defining acceptable medical sources as licensed physicians, licensed or certified

psychologists, and—for limited purposes—licensed optometrists, licensed podiatrists, and

qualified speech-language pathologists). The opinions of non-acceptable medical sources are not

entitled to any particular weight, and the ALJ is not required to explain the weight given to such

opinions unless it might affect the case's outcome. See Adkins v. Colvin, No. 4:13–cv–00024,

2014 WL 3734331, at *3 (W.D. Va. July 28, 2014); see also Craig v. Chater, 76 F.3d 585, 590

(4th Cir. 1996) (finding no error in ALJ's failure to expressly weigh the opinion of claimant's

physical therapist).

Nevertheless, the ALJ has a duty to consider all of the evidence available in a claimant's

case record, including evidence provided from medical sources who are not "acceptable medical

sources" such as a physician assistant.[14] Ingle v. Astrue, 1:10–cv–141, 2011 WL 5328036, at *3

(W.D.N.C. Nov. 7, 2011) (citing SSR 06–03p); 20 C.F.R. Sec. 404.1527(f). While evidence from

these non-acceptable medical sources cannot be used to establish the existence of a medically

determinable impairment, "such sources may provide evidence, including opinion testimony,

regarding the severity of the claimant's impairments and [how] such impairment[s] affect the

individual's ability to function." Id. (citing SSR 06–03p; 20 C.F.R. Sec. Sec. 404.1513(d),

416.913(d)); see also Ledbetter v. Astrue, 8:10-cv-00195, 2011 WL 1335840, at *10 (D.S.C.

April 7, 2011) ("[O]pinions from medical sources, even when not 'acceptable medical sources,'

---

[14] To determine the weight given to the opinion of a source who is not an "acceptable medical source" as defined by the Act, the ALJ should consider: (1) the length of time the source has known the claimant and the frequency of their contact; (2) the consistency of the source's opinion with the other evidence; (3) the degree to which the source provides supportive evidence; (4) how well the source explains his or her opinion; (5) whether the source has an area of specialty or expertise related to the claimant's impairments; and (6) any other factors tending to support or refute the opinion. Beck v. Astrue, No. 3:11–cv–00711, 2012 WL 3926018, at *12 (S.D.W. Va. Sept. 7, 2012) (citing SSR 06-03p). As described below, the ALJ fully considered the record, including Mr. Lentz's medical opinions.

are important and should be evaluated on key issues such as impairment severity and functional effects.") (citing SSR 06-03p).

Here, the ALJ appropriately considered these factors and the record in determining that the opinions of Dr. Gaylord and Mr. Lentz merited only little weight. The ALJ acknowledged Derek's treatment relationship with Dr. Gaylord and Mr. Lentz, and he provided a detailed description of Derek's treatment between 2012 and 2014.[15] The ALJ also adequately supported his conclusion that Dr. Gaylord and Mr. Lentz's medical opinions were not consistent with the medical record.

Regarding Derek's mental health, Dr. Gaylord and Mr. Lentz's medical opinions suggest that Derek suffered depression and memory issues dating back to 2008 and further found that these mental impairments would prevent him from "maintain[ing] gainful employment."[16] R. 477. The ALJ found that the severity of symptoms described in the opinions—specifically concerning memory and concentration—do not match the description of Derek's symptoms pre-DLI. R. 1535–44.

Derek regularly sought treatment at the Salem VAMC between 2012 and 2014 for anxiety and depression. See R. 1544 (ALJ acknowledging Derek's complaints of anxiety and depression). Nevertheless, the ALJ found that Derek "received relatively little mental health treatment prior to his date last insured." R. 1535. Derek's treating psychologist between 2012

---

[15] Despite Derek's assertion that the ALJ does not identify the treating providers by name, the ALJ specifically references Dr. Gaylord and Mr. Lentz and he provided a detailed analysis of their respective medical opinions as well as a detailed overview of Derek's treatment at the Salem VAMC from 2012 to 2014. R.1537–44.

[16] There is no indication why the medical opinions extend to 2007 or 2008 when the medical opinions and Mr. Lentz's treatment of Derek did not commence until 2012.

and 2014 consistently recorded stable mental health that was managed by his treatment plan.[17]
See, e.g., R. 594. Derek's providers conducted several safety assessments showing a relatively
stable mental state. R. 530–32, 562–63, 595–96, 601–02. Derek generally reported his
hopelessness, stress, and depression as either "less" or "about the same" as the previous visit—
suggesting no increase in severity. Id. Additionally, during these visits, Derek's providers found
that he presented no risk of harm to himself or to others. Id. And, even when Derek specifically
complained of frustration or distress, he often reported improvement in symptoms by his next
appointment. R. 586, 590, 594. Thus, the ALJ adequately supported his conclusion that Derek's
depression would not affect his ability to work.[18]

    The ALJ also sufficiently supported his conclusion that Derek had no deficit in memory
prior to his DLI that would impact his ability to work. Derek occasionally reported memory or
concentration difficulties to his providers. R. 589, 594. Yet, when raised, Derek's providers did
not immediately follow-up on these concerns and even recorded Derek's claim that his "coping
skills enable[d] him to manage the symptoms without medication." R. 594. Moreover, Derek's
treating psychologist reported on many occasions that Derek's attention was good and his
memory functions were intact. R. 595, 601, 1539. Mr. Lentz's treatment notes from the same
time period do not indicate otherwise. Furthermore, Mr. Lentz treated Derek both pre- and post-
DLI. Mr. Lentz's treatment notes pre-DLI do not expressly indicate concern about memory or
concentration. Mr. Lentz first describes Derek's memory problems in his November 18, 2014,

---

[17] Derek cites evidence that he had suicidal ideation. Pl.'s Br. at 6, Dkt. 11. Derek told Jennifer Caldwell,
Ph.D., about suicidal plans in 2010, but otherwise consistently reported no thoughts of harming himself prior to his
DLI. R. 526. The medical opinions cited also do not support suicidal ideation. R. 1479, 1825.

[18] Though the medical opinions cite depression as a diagnosis, only one of the medical opinions directly
states that depression would affect Derek's ability to work. R. 489.

medical opinion, which reported that "[Derek] has recently developed memory difficulties." R. 483.

Regarding Derek's physical impairments, Dr. Gaylord and Mr. Lentz's medical opinions suggest that his diagnoses—primarily chronic pain and avascular necrosis of both hips—would make it "very difficult for [Derek] to maintain gainful employment."[19] R. 481. The opinions consistently state that Derek's diagnoses would result in his absence more than three times per month, that pain would frequently interfere with his ability to perform his job, and that he would require multiple breaks throughout the workday. R. 477, 485, 617, 1478, 1819, 1824.

The ALJ's conclusion affording little weight for these opinions is supported by the medical record. To support his conclusion, the ALJ referenced treatment provider notes suggesting that Derek's pain and symptoms were adequately controlled with medication. R. 397, 421, 431, 571–72, 636 (chronic pain is controlled with medication). The ALJ further supported his conclusion noting that Derek was able to perform several activities of daily living when taking his medication. See, e.g., R. 624 ("[Derek's medication] allows him to do his chores around the house, yardwork, and ADL's."). Derek complains that the ALJ wrongly and exclusively relied on his activities of daily living to support his decision since he participated in only "minimal activities" that do not show that he "can do [] full-time work . . . on a sustained basis."[20] Pl.'s Br. at 18, Dkt. 11. While the ALJ relied on these activities of daily living, the ALJ

---

[19] The medical opinions consistently list avascular necrosis of both hips. Derek's other physical impairments, e.g. Crohn's disease, low back pain, hypertension, and degenerative disk disease, are inconsistently listed. R. 477, 485, 617, 1478, 1819, 1824. Derek's argument focuses on avascular necrosis of the hips as well. See Pl.'s Br. at 16, 25, Dkt. 11.

[20] Derek also points to Brown, 873 F.3d 251, to support his argument. Pl.'s Br. at 17–18, Dkt. 11. This case is distinguished from Brown where the Fourth Circuit concluded that the ALJ had committed multiple errors, including failing to acknowledge the extent of the daily activities of living. 873 F.3d at 263. The ALJ here clearly understood Derek's limits and included Derek's many self-reported limitations to activities of daily living in his opinion. See 1538–39, 1544.

also pointed to Derek's own treatment providers at the time (including Mr. Lentz), who

recommended that Derek "increase physical activity as much as possible." See, e.g., R. 625.

Considered with the rest of the medical record, the ALJ reasonably concluded that Derek's

treatment providers "felt he was more capable during this [pre-DLI] period." R. 1544. Thus,

contrary to Derek's assertion, the ALJ pointed to more than activities of daily living to support

his conclusion that the medical opinion evidence warranted little weight with respect to Derek's

physical impairments.

The ALJ provided sufficient analysis of the factors in 20 C.F.R. § 416.927(c)(2). See

Hendrix v. Astrue, No. Civ. A 1:09-01283, 2010 WL 3448624, at *3 (D.S.C. Sept. 1, 2010)

("[A]n express discussion of each factor is not required so long as [the ALJ] applied the . . .

factors and provides good reasons for his decision."). The ALJ specifically considered Derek's

treatment relationships with Dr. Gaylord and Mr. Lentz in his summary of the medical evidence.

He also considered the entire medical record, Derek's self-reported activities of daily living, and

Derek's testimony—all of which sufficiently suggest that Derek did not suffer mental or physical

impairments to the degree set out in Dr. Gaylord and Mr. Lentz's medical opinions prior to his

date last insured. I conclude that substantial evidence supports the ALJ's decision to give the

opinions of Dr. Gaylord and Mr. Lentz little weight.

### D. Residual Functional Capacity

Derek generally asserts that the ALJ failed to properly assess his RFC within his treating

physician argument. Pl.'s Br. at 20–21, Dkt. 11. Derek asserts that medical sources did not state

"that [Derek] can perform full time sedentary work with the [RFC's] physical and mental

limitations." Id. at 20. He cites language from SSR 96–8P, requiring an ALJ's RFC assessment

to include medical and nonmedical evidence demonstrating that a claimant can sustain work. Id.

at 20. Derek himself does not expressly analyze the medical and nonmedical evidence in making

this argument. Id. 20–21. I briefly address RFC arguments below but note that Derek did not

clearly raise these arguments.

The ALJ adequately assessed Derek's mental impairments and ability to maintain

concentration, persistence, and pace as required by SSR 96–8P. See Titles II & Xvi: Assessing

Residual Functional Capacity in Initial Claims, SSR 96–8P (S.S.A. July 2, 1996).[21] SSR 96–8P

requires the ALJ to include a narrative discussion describing how the evidence supports his

conclusions when developing the RFC. Teague v. Astrue, No. 1:10-cv-2767, 2011 WL 7446754,

at *8 (D.S.C. Dec. 5, 2011). The ALJ "must include a narrative discussion describing how the

evidence supports each conclusion, citing specific medical facts (e.g. laboratory findings) and

nonmedical evidence (e.g., daily activities, observations)." SSR 96–8P at *7; Meadows v.

Astrue, No. 5:11-cv-63, 2012 U.S. Dist. LEXIS 115150, at *24 (W.D. Va. Aug. 15, 2012) (citing

Davis v. Astrue, No. 9-cv-2545, WL 5327850, at *5 (D. Md. Dec. 15, 2010)); Monroe v. Colvin,

826 F.3d 176, 189 (4th Cir. 2016) (emphasizing that the ALJ must "build an accurate and logical

bridge from the evidence to his conclusion" and holding that remand was appropriate when the

ALJ failed to make "specific findings" about whether the claimant's limitations would cause him

to experience his claimed symptoms during work and, if so, how often).

In Shinaberry v. Saul, the Fourth Circuit clarified that an "ALJ cannot summarily

'account for a claimant's limitations in concentration, persistence, and pace by restricting the

hypothetical question to simple, routine tasks or unskilled work,' because 'the ability to perform

---

[21] Social Security Rulings are "final opinions and orders and statements of policy and interpretations" that
the Social Security Administration has adopted. 20 C.F.R. § 402.35(b)(1).  Once published, these rulings are binding
on all components of the Social Security Administration. Heckler v. Edwards, 465 U.S. 870, 873 n.3 (1984); 20
C.F.R. § 402.35(b)(1). "While they do not have the force of law, they are entitled to deference unless they are
clearly erroneous or inconsistent with the law." Pass v. Chater, 65 F.3d 1200, 1204 n.3 (4th Cir. 1995).

simple tasks differs from the ability to stay on task.'" No. 18-2096, 2020 WL 908887, at *4 (4th Cir. 2020) (quoting Mascio v. Colvin, 780 F.3d 632, 638 (4th Cir. 2015)). However, Mascio does "not impose a categorical rule that requires an ALJ to always include moderate limitations in concentration, persistence, or pace as a specific limitation in the RFC." Id. In contrast, Shinaberry highlights "sister circuits" who conclude that "limiting the hypothetical to include only unskilled work sufficiently accounts for such limitations [in concentration, persistence, or pace]" when the "medical evidence demonstrates that a claimant can engage in simple, routine tasks, or unskilled work, despite [these] limitations." Id. (quoting Winschel v. Comm'r of Soc. Sec., 631 F.3d 1176, 1180 (11th Cir. 2011)). Shinaberry further confirms that Mascio does not broadly dictate that a claimant's moderate impairment in concentration, persistence, or pace always translates into a limitation in the RFC, but instead underscores the ALJ's duty to adequately review the evidence and explain his decision. See also Monroe, 826 F.3d 176 (emphasizing that the ALJ must provide a sound basis for his ruling, including discussing what evidence he found credible and specifically applying the law to the record).

The ALJ found a moderate impairment in concentration, persistence, or pace.[22] R. 1536. Contrary to Derek's suggestion, the ALJ adequately supported his findings that a limitation to simple, sedentary work accounts for the claimant's moderate impairment in concentration, persistence, and pace,[23] especially given the ALJ's specific accounting for Derek's time off-task.

---

[22] Though Derek does not raise this issue, the ALJ describes the limitations as moderate in his analysis and as both mild and moderate in the RFC. See R. 1536–37. Out of an abundance of caution, the court will analyze Derek's impairments in concentration, persistence, and pace as moderate.

[23] As described earlier, I found that the ALJ's designation of little weight for post-DLI medical opinions was supported by substantial evidence. These opinions provide the strongest and only concrete evidence from Derek's medical providers that he would be unable to sustain work for a full workday. It is also worth noting that these medical opinions do not consistently describe Derek's limitations. See, e.g., R. 1479, 1825 (showing different selections in attention, concentration, and intellectual section despite backdating both forms to 2008).

R. 1537 (stating Derek would be "off task up to a maximum of ten percent of the day (apart from

regularly scheduled break periods")).

As previously discussed, the ALJ concluded that limitations in concentration, persistence,

or pace during the pre-DLI period were not based on mental impairments.[24] See infra Part C. The

ALJ noted, however, that Derek reported distraction "secondary to pain and ruminating

thoughts." R. 1536. Nevertheless, the ALJ found, despite Derek's testimony suggesting poor

concentration, R. 1539, that his pain pre-DLI was managed by his medication regimen. He

supported this conclusion, referencing treatment records, Derek's reports of activities of daily

living, and his treating providers' recommendations that he engage in additional activity.[25] See

infra Part C. Moreover, the ALJ concluded that Derek was able to carry out simple, one-to-two

step instructions. R. 1536; R. 595, 601, 1539 (pre-DLI suggesting good attention, thought

process, judgment, and memory); R. 1480, 1827 (post-DLI medical opinions suggesting "no[] to

mild limitation" in following simple instructions).

The ALJ also appropriately supported Derek's ability to sustain work, noting that

"moderate pain or discomfort is not, in itself, incompatible with the performance of sustained

work activity." R. 1544. The ALJ concluded that Derek's statements concerning the intensity,

persistence, and limiting effects were not consistent with the medical record pre-DLI and again

relied in part on Derek's activities of daily living as described by his treating providers. Id. The

treating providers' descriptions of Derek's activities of daily living are not detailed, however, the

---

[24] The ALJ found that Derek's providers during the pre-DLI period found that "his attention was good and that his memory functions were intact." R. 596, 601, 1539. The ALJ noted that this contradicted Derek's self-reports and the post-DLI medical opinions.

[25] The ALJ does not specifically cite to Derek's self-report that his concentration and memory problems were managed "without medication," however, it is worth noting that Derek's treatment providers did not follow-up with any specific recommendation for treatment or referrals when Derek made this statement. R. 594.

providers do not indicate any limitation with regard to the ability to sustain work. See infra Part

C. Derek does not point to any specific facts or medical records that the ALJ failed to consider.

See R. 20–21. Moreover, the post-DLI medical opinions are inconsistent in their presentation of

Derek's ability to sustain work. In their October 2016 opinion, Dr. Gaylord and Mr. Lentz

identify no "signs and symptoms that support [their] diagnosis and assessment" with regard to

"[a]ttention, [c]oncentration, & [i]ntellectual," but also found a moderate-to-marked limitation

regarding maintaining concentration and attention for extended periods.[26] R. 1479–80. The

medical opinions do not include narratives to support or explain the findings, and the ALJ was

unable to find any support in the pre-DLI medical record. See R. 1478, 1824.

The ALJ's review of the record was sufficient and his reasoning rests on a detailed

consideration of record evidence, and Derek does not specifically raise any arguments as to why

the RFC is insufficient. See R. 20–21. This court is not "left to guess about how the ALJ arrived

at his conclusions." Mascio, 780 F.3d at 637. As such, I conclude that substantial evidence

supports the ALJ's conclusions regarding Derek's RFC.

### E. Subjective Allegations

Derek argues that the ALJ's assessment of his allegations is not supported by substantial

evidence. Pl.'s Br. at 21–23, Dkt. 11. In support Derek argues that the activities of daily living

referenced by the ALJ do not establish that Derek is capable of full-time work.[27] Id.

---

[26] In the October 2016 medical opinion, Dr. Gaylord and Mr. Lentz found "no[] to mild" limitation in carrying out simple instructions, sustaining an ordinary routine without supervision, and making simple work-related decisions, "moderate" limitations in carrying out detailed instructions, performing activities within a schedule, and working in coordination with others, and "moderate to marked" limitations in maintaining attention and concentration for extended periods, completing a workday without interruptions from psychological symptoms, and performing at a consistent pace without rest periods of unreasonable length or frequency. R. 1478. The July 2018 medical opinion suggested further limitations. R. 1824

[27] Derek again argues that the ALJ's conclusions about Dr. Gaylord and Mr. Lentz's medical opinions are unsupported. Pl.'s Br. at 21–23, Dkt. 11. As these arguments are addressed in Part C, I do not repeat them here.

Under the regulations implementing the SSA, an ALJ follows a two-step analysis when considering a claimant's subjective statements about impairments and symptoms. Soc. Sec. Ruling 16–3p Titles II & Xvi: Evaluation of Symptoms in Disability Claims, SSR 16–3P, 2017 WL 5180304 (S.S.A. Oct. 25, 2017); 20 C.F.R. §§ 404.1529(b)–(c), 416.929(b)–(c). First, the ALJ looks for objective medical evidence showing a condition that could reasonably produce the alleged symptoms, such as pain.[28] Id. at *3, §§ 404.1529(b), 416.929(b). Second, the ALJ must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's ability to work. Id. §§ 404.1529(c), 416.929(c). In making that determination, the ALJ must "examine the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record." Id.

The ALJ's opinion included a detailed discussion of Derek's medical history, along with Derek's own allegations, and the ALJ adequately supported his findings that Derek's allegations were not entirely consistent with the medical evidence in the record. R. 1542. In summarizing the evidence, the ALJ pointed to Derek's hearing testimony,[29] specifically, his statements that his "veteran friends came by to help him with daily chores," that "he almost burnt the house down because he forgot about food on the stove," and his subjective reports regarding pain and his ability to sit and walk. Id.

---

[28] SSR 16–3p states that a claimant must provide "objective medical evidence from an acceptable medical source to establish the existence of a medically determinable impairment that could reasonably be expected to produce [the] alleged symptoms." Id. Objective medical evidence consists of medical signs ("anatomical, physiological, or psychological abnormalities established by medically acceptable clinical diagnostic techniques") and laboratory findings "shown by the use of medically acceptable laboratory diagnostic techniques." Id.

[29] Derek had two hearings in this matter. Derek consistently backdated his testimony to before his DLI. See 1538–39.

Ultimately, however, the ALJ concluded that Derek's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." R. 1542. While the ALJ agreed that Derek may "experience mild to moderate pain or discomfort," he concluded that the totality of the evidence established that Derek's pain was managed while on medication. R. 1542, 1544; see R. 87, 397, 421, 431, 571–72, 636 (provider's notes suggesting pain controlled on medication). The ALJ also cited Derek's providers' recommendation that he increase his activity and determined that his providers to be "more capable" during this time. R. 1544; R. 572–73, 625. Finally, the ALJ relied on Derek's activities of daily living, which Derek self-reported to his providers regularly. R. 1544; R. 397, 421, 547, 565, 624, 759.

Given the ALJ's thorough review of the medical opinion testimony, Derek's hearing testimony, and the medical record as a whole, the ALJ's analysis regarding Derek's impairments is sufficient. I will not re-weigh the evidence.

### F. Treatment of VA's Disability Determination

Derek argues that the ALJ erred in assessing the VA's disability determination. Pl.'s Br. 23–25, Dkt. 11. Derek, who now has a one-hundred percent disability rating by the VA, had "a ninety percent service-connected disability during the adjudicated period, including fifty percent for his hip prosthesis and thirty percent for colitis." R. 1544.

Disability determinations made by other governmental agencies do not bind the SSA, but the ALJ still must "evaluate all the evidence in the case record that may have a bearing on [the] determination or decision of disability." Titles II and Xvi: Considering Decisions on Disability by Other Governmental and Nongovernmental Agencies, SSR 06–03P (S.S.A. Aug. 9, 2006). In Bird, the Fourth Circuit directly addressed the weight that an ALJ should assign to the

22

determinations of the VA.[30] 699 F.3d at 337. The Fourth Circuit acknowledged that the SSA and

VA apply different standards in determining disability, but noted that both agencies "serve the

same governmental purpose of providing benefits to persons unable to work because of a serious

disability," and that both require extensive medical documentation. Id. at 343. As a result, a

disability rating by one of the two agencies remains "highly relevant to the disability

determination of the other." Id. Accordingly, an ALJ must presumptively afford a VA

determination substantial weight. Id.

However, the Fourth Circuit also recognized that the "SSA employs its own standards for

evaluating a claimant's alleged disability, and the effective date of coverage . . . under the two

programs will likely vary." Id. Therefore, the Commissioner may afford a VA determination less

than substantial weight when "the record before the ALJ clearly demonstrates that such a

deviation is appropriate." Id.

Here, the ALJ clearly indicated why deviation from the VA determination was

appropriate and why he did not afford the determination substantial weight. Derek argues that the

ALJ cannot "discount the determination from the VA because it uses a different standard for

determining and assigning disability" from the SSA. Pl.'s Br. at 24, Dkt. 11. Derek is correct that

an ALJ may not entirely base his analysis in differences between the SSA and VA. See Stanley

v. Berryhill, No. 1:17–cv–913, 2019 WL 919355, at *5 (M.D.N.C. Feb. 25, 2019) (remanding on

the basis that "the ALJ's rationale relies only on the differences between the VA and SSA

disability systems, without making any particular findings as to Plaintiff's case"). Here, the ALJ

does not entirely rely on the differences between the VA and SSA. R. 1544. He also relied on

---

[30] Effective March 27, 2017, the SSA no longer analyzes decisions made by other agencies. 20 C.F.R. Sec. 404.1504 (2017). Thus, Bird does not control claims filed after March 27, 2017. Derek filed his claim in 2014, thus Bird applies here.

evidence of Derek's activities of daily living and treatment provider notes that Derek's pain was managed by medication.[31] Id.

Substantial evidence in the record supports the ALJ's decision to conclude that the VA determination merited less than substantial weight, and the ALJ adequately explained pursuant to the requirements in Bird.

## CONCLUSION

For the foregoing reasons, I **RECOMMEND GRANTING** the Commissioner's Motion for Summary Judgment and **DENYING** Derek's Motion for Summary Judgment.

The Clerk is directed to transmit the record in this case to Glen E. Conrad, Senior United States District Judge, and to provide copies of this Report and Recommendation to counsel of record.

Both sides are reminded that pursuant to Rule 72(b), they are entitled to note any objections to this Report and Recommendation which must be filed within fourteen (14) days hereof. Any adjudication of fact or conclusion of law rendered herein by me that is not specifically objected to within the period prescribed by law may become conclusive upon the parties. Failure to file specific objections pursuant to 28 U.S.C. § 636(b)(1) as to factual recitations or findings as well as to the conclusion reached by me may be construed by any reviewing court as a waiver of such objections, including a waiver of the right to appeal.

Entered:  February 16, 2021

*Robert S. Ballou*

Robert S. Ballou
United States Magistrate Judge

---

[31] Derek additionally argues that "the fact that his Crohn's disease was asymptomatic during the period at issue is irrelevant to the VA disability determination." Pl.'s Br. at 25, Dkt. 11. The ALJ does cite evidence about Derek's Crohn's disease, but his explanation is not limited to Crohn's disease. R. 1544. The ALJ also describes Derek's hip pain. Id.